IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
August 13, 2002 Session

## STATE OF TENNESSEE v. MICHAEL GEORGE MEDINA

**Appeal from the Criminal Court for Smith County**
**No. 99-270     J. O. Bond, Judge**

---

**No. M2001-02412-CCA-R3-CD - Filed October 2, 2002**

---

The Appellant, Michael George Medina, appeals his conviction by a Smith County jury finding him guilty of first-degree murder. On appeal, Medina challenges (1) the sufficiency of the convicting evidence, as it relates to the element of premeditation, and (2) the trial court's ruling which he asserts interfered with the defense's order of proof, thus, "forcing a premature election on defendant's right to testify." After review, we find no error. Accordingly, the judgment is affirmed.

**Tenn. R. App. P. 3; Judgment of the Criminal Court Affirmed.**

DAVID G. HAYES, J., delivered the opinion of the court, in which DAVID H. WELLES and NORMA McGEE OGLE, JJ., joined.

Gregory D. Smith, Clarksville, Tennessee, for the Appellant, Michael George Medina.

Paul G. Summers, Attorney General and Reporter; Michael Moore, Solicitor General; Renee W. Turner, Assistant Attorney General; Tom P. Thompson, Jr., District Attorney General; and David E. Durham, Assistant District Attorney General, for the Appellee, State of Tennessee.

## OPINION

### Factual Background

On September 26, 1999, Jennifer Medina was found in the home she had shared with the Appellant, lying in a pool of blood with a fatal gunshot wound to the head. The autopsy report and physical evidence established that death was produced by a 9 mm gunshot wound, with the gun's barrel touching her head when the gun was fired. The Appellant, the estranged husband of the victim and present at the scene, was charged with the homicide.

The parties were married in 1991 and had one child, who was two years old. The child, Austin, had been diagnosed with cancer and, during this time, was undergoing chemotherapy treatments at Vanderbilt Hospital in Nashville, in addition to receiving intravenous medication at home. By 1999, the marriage had seriously deteriorated, and the Appellant had filed for divorce. After the divorce was filed, the victim resided with her best friend and next-door neighbor, Ellen Newman. The Appellant continued to reside in the marital residence with his minor children from a prior marriage. The parties agreed to a temporary order, which provided for shared custody of Austin. The divorce action was characterized as hostile and bitter, as were the ensuing temporary custody battles.

On August 20, 1999, an order of protection was issued against the Appellant, based upon a finding of domestic abuse after the Appellant refused to comply with the terms of the temporary custody agreement. On this occasion, the victim was thrown against a wall by the Appellant and sustained bruises and a knot on her head.

Also in August 1999, the victim contacted Crime Stoppers in Franklin, Tennessee, and reported that the Appellant had stolen a "bobcat" loader in June 1997. She provided details of how the theft occurred, how the Appellant had repainted it and removed the serial numbers, and to whom it was sold. The Appellant was contacted by a detective, and he claimed that the victim was manufacturing the charges because he had been given custody of their child. The details provided by the victim were subsequently verified by the police, and the Appellant was arrested on August 26th for the theft. The victim would have been a material witness in the case.

After the arrangements under two joint custody orders had failed, temporary custody of the minor child and child support were awarded to the victim on September 10, 1999. The order provided the Appellant visitation on Monday through Thursday from 5:00 p.m. to 6:30 p.m. and every other weekend from Friday at 5:00 p.m. to Sunday at 5:00 p.m. The Appellant was permitted to retain possession of the marital residence, and the victim was responsible for delivering the child to and from the residence during the Appellant's visitation periods.[1]

At approximately 5:00 p.m. on the day of her death,[2] the victim left the Newman residence on foot to go and retrieve Austin from his father following visitation. It was the victim's normal practice to remain outside the residence when picking up her son. Before leaving, the victim told Ellen Newman that she would be back in five minutes. She carried no purse or bags with her.

Approximately two and one-half hours later, a 911 call was made from the marital residence. When officers responded to the call, they found the Appellant outside with Austin in his arms. Upon entering the residence, deputies found the victim lying on the floor with a gunshot wound to the

---

[1] The order also set aside a quitclaim deed the victim had executed conveying her interest in the marital property, the court finding the deed had been executed under duress.

[2] This date was a Sunday and was also the victim's twenty-seventh birthday.

head. A .38 caliber revolver was found near her head and a 9mm semi-automatic handgun was found near her knee. The serial number on the .38 revolver was removed and no identifiable fingerprints were found on either weapon. The .38 caliber revolver was fully loaded and had not been fired. A 9 mm shell casing was found on the floor in the kitchen area and a 9 mm projectile was removed from the floor, where it was embedded.

The Appellant was taken into custody and subsequently gave a statement to Tennessee Bureau of Investigation Agent Jason Locke. The Appellant stated that the victim had brought the .38 revolver with her into the house and then refused to leave. He claimed that she wanted to talk about reconciling. The Appellant also stated that he was afraid of her as she was hysterical at times.[3] He stated that, after he saw her with the gun, he retrieved his 9 mm pistol from the safe in the bedroom. He explained that he put the gun in his back pocket so that the victim would not see it. During this period, the victim remained in the living room of the house. The Appellant stated that an argument ensued and "she kept pointing the gun at me. . . . I turned around and she was right in front of me. And I couldn't see the gun any more, she was just too close to me, I didn't know where it was, and I grabbed her and I pushed her. We hit the ground, and all three of us hit together." When the victim fell, he heard a gunshot. The Appellant denied shooting the victim. During the scuffle, the Appellant maintained that his pistol remained in his back pocket and he offered no explanation as to how his pistol shot the victim.

Several witnesses testified that the victim did not own a gun. No one saw her entering the residence with a gun that day, including the Appellant's three sons from a prior marriage who were present outside the house when she arrived.[4] Several witnesses also testified that the victim had no plans to reconcile with the Appellant. The victim's father testified that she and Austin had in fact planned to move to Illinois and live with him after the divorce.

At trial, the State argued that the Appellant had lured the victim into the residence on this date, had shot her in the head, and then planted the .38 pistol by her body. On April 12, 2001, the Appellant was found guilty by a jury of first-degree premeditated murder. This appeal follows.

**Analysis**

**I. Sufficiency of the Evidence**

The Appellant argues that the evidence introduced at trial was insufficient to support his

---

[3]The post-mortem examination revealed that the twenty-seven-year-old victim was sixty-four inches tall and weighed ninety-two pounds.

[4]Joe Medina, the Appellant's twelve-year-old son, did testify at trial that he went to the door while the victim was inside and saw her holding a gun at that point. However, on cross-examination, the son admitted that in his initial statement to the investigator, he did not indicate that he had seen the victim with a gun. The son also admitted that the Appellant had told him what happened and left notes to him describing what had happened.

conviction for the first-degree murder of his wife, Jennifer Medina. Specifically, he contends that the State failed to prove the element of premeditation.

A jury conviction removes the presumption of innocence with which a defendant is initially cloaked and replaces it with one of guilt, so that on appeal, a convicted defendant has the burden of demonstrating that the evidence is insufficient. *State v. Tuggle*, 639 S.W.2d 913, 914 (Tenn. 1982). In determining the sufficiency of the evidence, this court does not reweigh or reevaluate the evidence. *State v. Cabbage*, 571 S.W.2d 832, 835 (Tenn. 1978). Likewise, it is not the duty of this court to revisit questions of witness credibility on appeal, that function being within the province of the trier of fact. *See generally State v. Adkins*, 786 S.W.2d 642, 646 (Tenn. 1990); *State v. Burlison*, 868 S.W.2d 713, 718-19 (Tenn. Crim. App. 1993). In fact, "a guilty verdict by the jury, approved by the trial judge, accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the theory of the State." *State v. Grace*, 493 S.W.2d 474, 476 (Tenn. 1973). To overcome this, the defendant must establish that the evidence presented at trial was so deficient that no reasonable trier of fact could have found the essential elements of the offense beyond a reasonable doubt. Tenn. R. App. P. 13(e); *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789 (1979); *State v. Cazes*, 875 S.W.2d 253, 259 (Tenn. 1994), *cert. denied*, 513 U.S. 1086, 115 S. Ct. 743, 130 (1995). The State is entitled to the strongest legitimate view of the evidence and all reasonable inferences which may be drawn therefrom. *State v. Harris*, 839 S.W.2d 54, 75 (Tenn. 1992), *cert. denied*, 507 U.S. 954, 113 S. Ct. 1368 (1993).

The State may prove a criminal offense by direct evidence, circumstantial evidence, or a combination of the two. *State v. Tharpe*, 726 S.W.2d 896, 899-900 (Tenn. 1987); *see also State v. Brown*, 836 S.W.2d 530, 541 (Tenn. 1992) ("the cases have long recognized that the necessary elements of first-degree murder may be shown by circumstantial evidence"). Before a jury may convict a defendant of a criminal offense based upon circumstantial evidence alone, the facts and circumstances "must be so strong and cogent as to exclude every other reasonable hypothesis save the guilt of the defendant, and that beyond a reasonable doubt." *State v. Crawford*, 225 Tenn. 478, 470 S.W.2d 610, 612 (Tenn. 1971); *see also State v. Gregory*, 862 S.W.2d 574, 577 (Tenn. Crim. App. 1993). As in the case of direct evidence, the weight to be given circumstantial evidence and "the inferences to be drawn from such evidence, and the extent to which the circumstances are consistent with guilt and inconsistent with innocence, are questions primarily for the jury." *Marable v. State*, 203 Tenn. 440, 313 S.W.2d 451, 457 (Tenn. 1958) (citation omitted).

First degree murder is defined as "a premeditated and intentional killing of another." Tenn. Code Ann. § 39-13-202(a)(1). The statute defines premeditation as follows:

> As used in subdivision (a)(1) "premeditation" is an act done after the exercise of reflection and judgment. "Premeditation" means that the intent to kill must have been formed prior to the act itself. It is not necessary that the purpose to kill pre-exist in the mind of the accused for any definite period of time. The mental state of the accused at the time the accused allegedly decided to kill must be carefully considered

in order to determine whether the accused was sufficiently free from excitement and passion as to be capable of premeditation.

Tenn. Code Ann. § 39-13-202(d); *State v. Sims*, 45 S.W.3d 1, 7-8 (Tenn. 2001).

After reviewing all the evidence in the record in the light most favorable to the prosecution, we cannot say that no reasonable trier of fact could have found the Appellant guilty of first-degree murder beyond a reasonable doubt. The jury was in the best position to view the witnesses and the evidence and determine, based upon that proof, whether the shooting was accidental or whether the Appellant intentionally and with premeditation murdered his wife. Mental states, such as the intent to kill, are not generally established by direct evidence, as most often the only remaining witness to the homicide is the defendant. Thus, the intent to kill may be inferred from the character of the defendant's conduct and the circumstances surrounding the commission of the offense. *See generally State v. Bland*, 958 S.W.651, 660 (Tenn. 1997).

Facts from which a jury may infer premeditation include use of a deadly weapon upon an unarmed victim, planning activities by the Appellant prior to the killing, the Appellant's prior relationship with the victim, and the nature of the killing. *Bland*, 958 S.W.2d 660; *State v. Gentry*, 881 S.W.2d 1, 4-5 (Tenn. Crim. App. 1993 (citation omitted).

The proof produced at trial established that it was not the normal routine of the victim to enter the residence when picking up her child and she had clearly told Ellen Newman that she would return in five minutes. Testimony further established that the Appellant had instructed his children to leave the residence during the time the victim would be picking Austin up following visitation. No one saw the victim enter the residence with a handgun. No fingerprints were found on either weapon located by the victim's body, nor could ownership of the .38 revolver be determined because the serial number had been removed. The Appellant denied he shot his wife; rather, he impliedly testified that she must have shot herself when "he, Jennifer and Austin all fell in a pile." The autopsy report showed that death resulted from a gunshot wound inflicted when the barrel was pressed to the victim's head. The physical evidence circumstantially established that the 9 mm pistol, which the Appellant admittedly possessed, was the weapon which produced the fatal wound. Finally, the record established several motives for the murder. *See Ivey v. State*, 360 S.W.2d 1,3 (Tenn. 1962) (holding that evidence tending to show motive is always relevant, particularly in cases built wholly or partially on circumstantial evidence). The victim and the Appellant were involved in a bitter divorce proceeding, the victim had reported the Appellant to the police for theft and was a material witness in that case, the victim had only days earlier obtained custody of the minor child in addition to being awarded child support, and the victim had indicated her intent to leave the State with their son.

These facts, which include use of a deadly weapon upon an unarmed victim, planning activities prior to the killing, the Appellant's prior relationship with the victim, including his motives for murder, and the nature of the killing, support the jury's finding of premeditation. After viewing

the evidence in the light most favorable to the State, we conclude that a reasonable trier of fact could have found the Appellant guilty of the first-degree murder of his wife.

## II. Election to Testify

The Appellant next contends that the trial judge committed error by "forcing a premature election" by the Appellant as to whether he was going to testify in the case.[5] This ruling occurred on the third day of trial and after the Appellant had already presented three witnesses in his defense. The testimony of the third witness was concluded at approximately 3:30 p.m., but the Appellant's remaining three witnesses were not present in the courtroom to testify.[6] The trial judge advised the Appellant that the court was "going on with what we have got and you can either close or do whatever you want to do." The Appellant asserts that this ruling forced him to decide prematurely, *i.e.*, before hearing his other witnesses, if he would testify and that this, in turn, hampered his defense because he was unable to evaluate the actual worth of all witnesses before deciding whether he should testify.

The Appellant and the State apparently had previously discussed the defense order of proof and when the respective witnesses would be needed at trial; however, neither realized that the trial would progress as quickly as it did. Nonetheless, it should be noted that the Appellant had been instructed by the trial judge on the previous day of the trial to have his witnesses present. We further note that a trial judge is not bound by an agreement of the parties, as it is within the province of the trial court to control the orderly disposition of the trial. Our review of this issue is conducted under an abuse of discretion standard. Reversal is not warranted unless the trial court "'applies an incorrect legal standard, or reaches a decision which is against logic or reasoning that causes an injustice to the party complaining.'" *State v. Shirley*, 6 S.W.3d 243, 247 (Tenn.1999). Under this standard, this court is not permitted to substitute its own judgment in place of the trial court's. *Id.*

---

[5]The State argues that the Appellant has waived the issue by not contemporaneously objecting at trial. Generally, the failure would result in a waiver. *State v. Burton*, 751 S.W.2d 440, 448 (Tenn. Crim. App. 1988). However, in the present case we find that the issue was preserved for appeal. It is clear from the record that the Appellant raised the issue during trial and at the appropriate time. In view of the following pronouncement of the trial judge, we find that any further objections by the Appellant would have been futile:

> THE COURT: We're sitting here at 3:30 and you have a client there that's going to be making a decision whether he's going to testify or not. We're going to be here until 5:30, that's the schedule of the Court today. That's the reason I said the other day to make sure you had all of your witnesses here. This having to wait for somebody to show up, we all knew what we were here for. If he's going to testify he can testify now, it will just be his turn. . . . I made that statement from the start of this trial that we weren't going to do this. . . . Well, we're going to go forward with the trial. I'm not going to stop until in the morning we all knew to be here, we're going on with what we have got and you can either close or do whatever you want to do. I'm just not going to do it.

[6]The three witnesses were the Appellant's sons, who were living with him on the date of the murder, but had been relocated to Kentucky after the Appellant's incarceration.

The Appellant argues that forcing him to testify or close his proof before all his witnesses had taken the stand is analogous to a *Brooks* violation. In *Brooks*, the United States Supreme Court held unconstitutional a Tennessee statute, which required that if a defendant wanted to testify as part of his proof, he had to do so before any other witnesses took the stand. *Brooks v. Tennessee*, 406 U.S. 605, 612-13 (1972).

We find the Appellant's reliance upon *Brooks* misplaced. Unlike *Brooks*, the Appellant was not required to testify first or not at all. Accordingly, we find no impingement of any constitutional right. Rather, we find that the trial court's ruling involved an order of proof issue, which is within the discretion of the trial judge, as the judge is responsible for the orderly and expeditious presentation of testimony. *State v. Barnard*, 899 S.W.2d 617, 624 (Tenn. Crim. App. 1994). While perhaps not the most prudent method of dealing with the remaining two hours left in the court day, we cannot say that it was an abuse of discretion to keep the trial moving forward, so as not to prevent additional inconvenience to the jurors or to incur added time and expense to the trial. The Appellant had been warned the previous day to have all his witnesses present and ready to testify. He chose instead to chance that they would not progress that far into the trial.

Even had we found this to be error on the part of the trial judge, the error would have been harmless. The Appellant asserts no prejudice to his case as a result of his decision to take the stand before his last three witnesses. Clearly the act did not "affirmatively appear to have affected the result of the trial on the merits." Tenn. R. Crim. P. 52(a). This issue is without merit.

For the above stated reasons, the judgment of conviction is affirmed.

                                               _____

                                               DAVID G. HAYES, JUDGE